JENKINS BROTHERS v. UNITED STATES (No. 4036)[1]

---

[1] T. D. 49093.
*268.

United States Court of Customs and Patent Appeals, May 29, 1937

*Barnes, Richardson & Halstead* (*Samuel M. Richardson* of counsel) for appellant. *Joseph R. Jackson*, Assistant Attorney General (*Samuel D. Spector*, special attorney, of counsel), for the United States.

[Oral argument April 6, 1937, by Mr. Samuel M. Richardson and Mr. Spector]

Before GRAHAM, Presiding Judge, and BLAND, HATFIELD, GARRETT, and LENROOT, Associate Judges

LENROOT, Judge, delivered the opinion of the court:

This appeal brings before us for review a judgment of the United States Customs Court, Third Division, involving the reappraisement of certain gauge glasses imported on January 9, 1935, from Scotland. They are of two kinds, one known as "Perth," a low-pressure gauge glass, and the other known as "Unific," a high-pressure gauge glass. They were entered at the port of New York at certain list prices, less discounts of 72½ per centum, 10 per centum, and 5 per centum for the Perth gauge glasses, and 75 per centum, 10 per centum, and 5 per centum for the Unific gauge glasses. The local appraiser appraised both types at their foreign market values, and he found such values to be their invoice units of value, less 62½ per centum and 2½ per centum, "cases and packing extra."

The importer appealed to reappraisement, and before the trial court it was agreed that the foreign market value is the dutiable value, that there was no dispute respecting the *per se* unit prices of the mer-

chandise, and that the only issue before the court was as to the discounts which should be allowed from such list prices to make foreign value of the merchandise. No question of export value is involved.

The material evidence produced upon the trial consists of Exhibit 1, being the affidavit of one John Moncrieff, managing director of the manufacturer and exporter of the gauge glasses, John Moncrieff, Ltd.; the record also contains two special agents' reports.

Upon the evidence produced, the trial court held that the dutiable values of the involved gauge glasses, at the time of the exportation thereof, "are the invoiced unit values, less 75 per centum discount, and 2½ per centum discount for cash, plus cases."

Upon review of this judgment by the Third Division, upon application of the Government, the judgment of the trial court was reversed and the dutiable value of the merchandise was found to be the *per se* unit prices stated on the invoice, with deductions of 62½ per centum and 2½ per centum, "to which should be added cases and packing."

Judgment was entered accordingly, and from such judgment this appeal was taken by the importer.

The evidence in behalf of appellant consists of the affidavit of one Moncrieff, managing director of the exporter, above referred to; attached to said affidavit and made a part thereof are a large number of invoices of sales of gauge glasses made by the exporter, a catalog, a price list, and a tabulated statement purporting to show the sales of all gauge glasses of the qualities known as Perth and Unific made by the manufacturer in Great Britain for use in the home markets during the months of September, October, and November 1934.

The affidavit of said Moncrieff divides the sales of gauge glasses made by his company into three classes, viz, "Users," "Retail," and "Wholesale." The affidavit states:

JOHN MONCRIEFF, Glass Manufacturer, Perth, Scotland, being duly Sworn Depone as follows, videlicet:—

I am Managing Director of John Moncrieff Limited, Glass Manufacturers, Perth, Scotland. My Company are manufacturers and sellers of Gauge Glasses of the qualities known as "Perth" and "Unific" which are sold to Messrs. Jenkins Brothers, New York. I am familiar with the prices paid by the said Jenkins Brothers for such Gauge glasses and I Depone and say that the prices actually appearing upon the Consular Invoices certified by the United States of America Consul at Dundee, Scotland, are in fact the actual prices paid by the said Jenkins Brothers to my Company for such Gauge Glasses.

I further Depone and say that similar Gauge Glasses are also sold by my Company.in Great Britian for use in the home markets, and I attach hereto a copy of my Company's Price List (on pages 4 and 6 whereof are stated the prices of said Gauge Glasses) three tabulated Statements shewing the sales of all Gauge Glasses of the above qualities effected by my Company in Great Britain for use in the home markets during each of the months of September, October, and November, 1934, together with a copy of the Invoice for each sale therein mentioned, and a Summary for the said three months, which Summary has been divided into

two heads (1) "Perth" quality and (2) "Unific" quality, each of which has been sub-divided into three heads, (1) Users, (2) Retail, and (3) Wholesale.

In regard to the sales classed under the head *Users* both of "Perth" and "Unific" qualities I Depone and say that these sales represent Gauge Glasses sold by my Company in small quantities to small consumers in Great Britain for their own use, and as will be seen from the said Summary, the total number of sales for the said period of three months was in the case of "Perth" quality 67 representing a total of 1585 Glasses valued at £24: 18/–, the average number of Glasses per sale being 24 and the average value of each sale 7/5d, while the percentage of total value was 5%. and the total number of sales in the case of "Unific" quality for the same period was 229 representing a total of 7008 Glasses valued at £196:15:5d, the average number of Glasses per sale being 31 and the average value of each sale 17/2d, while the percentage of total value was 22%. Such sales constitute only a small part of the Gauge Glass sales of said qualities effected by my Company in Great Britain for use in that Country and are not sales in the usual wholesale quantities.

In regard to the sales classed under the head *Retail* both of "Perth" and "Unific" qualities I Depone and say that these sales represent Gauge Glasses sold by my Company to retail firms who are selling only to users. Such sales comprise a diversity of sizes and lengths / / *  *  * of Gauge Glasses in comparatively small lots and are not sales in the usual wholesale quantities and in the ordinary course of trade, and as will be seen from the said summary the total number of such sales for the said period of three months in the case of "Perth" quality was 295 representing a total of 10,880 Glasses valued at £151:13:9d, the average number of Glasses per sale being 37 and the average value of each sale 10/3d, while the percentage of total value was 28%, and the total number of sales in the case of "Unific" quality was 333 representing a total of 16,385 Glasses valued at £295:3:5d, the average number of Glasses per sale being 49 and the average value for each sale 17/9d, while the percentage of total value was 33%, and I Depone and say that it was the practice of such retail customers to carry stocks of Gauge Glasses, but owing to the change in the nature of trade such customers now carry no stock and supply their requirements with smaller and more often repeated orders, the result of which has been to increase the number of such sales without increasing the quantity and value of the goods sold.

In regard to sales classed under the head *"Wholesale"* both of "Perth" and "Unific" qualities I Depone and say that such sales represent Gauge Glasses sold by my Company in the usual wholesale quantities and in the ordinary course of trade to customers in Great Britain for use in the home market / / *  *  *, and as will be seen from the said Summary the total number of such sales for the said period of three months was in the case of "Perth" quality 86 representing a total of 31,930 Glasses valued at £366:17:3d, the average number of Glasses per sale being 372 and the average value of each sale £4:3:4d, while the percentage of total value was 67%, and the total number of sales in the case of "Unific" quality was 198 representing a total of 25,156 Glasses valued at £402:7:3d, the average number of Glasses per sale being 127 and the average value of each sale £2:–:8d, while the percentage of total value was 45%, and I Depone and say that while the number of Wholesale sales shown in the said Summary is less than the number of Retail sales shown thereon this is accounted for by the fact that the retailers are buying in smaller and more often repeated orders than hitherto and to the fact that my Company's wholesale business in Gauge Glasses of the said qualities is a world wide one, that a large number of wholesale sales is effected with Countries outside Great Britain and the United States of America, and that accordingly the number of Wholesale sales shewn in said Summary, which relates only to sales

effected by my Company in Great Britain for home consumption, represents only a proportion of my / / * · * * Company's total Wholesale sales to all purchasers: And I further Depone and say that while I have stated that all sales classified under the heading Wholesale are in the usual wholesale quantities it is difficult to state what should be regarded as the usual wholesale quantity of Gauge Glasses of the type sold to the United States of America as purchasers of such Glasses in this Country usually place a yearly stock order for, say, one thousand or more Glasses of various lengths and diameters and then throughout the year very small supplementary orders, all of which in said Summary are included as Wholesale sales, and I therefore affirm that all sales of Gauge Glasses shewn in the said Summary under the heading Wholesale constitute the major portion of sales of Gauge Glasses effected by my Company to customers in Great Britain for use in the home market and are of the usual wholesale quantities and in the ordinary course of trade.

     *      *      *      *      *      *      *

* * * And I further affirm that Gauge Glasses of the qualities aforesaid are freely offered for sale to all purchasers in Great Britain in wholesale quantities in the ordinary course of trade, and my Company is and has been ready and willing to sell to any and all purchasers Gauge Glasses of the type sold to the said Jenkins Brothers at the prices and discount shewn on the said Invoices of Gauge Glasses to them.

     *      *      *      *      *      *      *

In one of the special agents' reports we find the following:

*Discounts:*

To the railway companies, which the manufacturer estimates purchase approximately 70% to 75% of the gauge glasses they sell in this market, a net price equal to the list price less 80% (with odd fractions deducted) is quoted. One other large purchaser in the Home Market receives 75% off the list prices.

Other purchasers receive various discounts off the list prices. It was not deemed advisable to make a detailed analysis of the sales records and discounts at this time in view of the manufacturer's estimate of the division of his business. From my inspection of the manufacturer's records it appeared that the large users purchased at least 50% of the Home Market sales and possibly up to the manufacturer's estimate of 75%.

     *      *      *      *      *      *      *

*Usual Wholesale Quantity:*

The usual wholesale quantity of gauge glasses sold in the Home Market is from 6 gross to 50 gross at a time to the class of buyer noted above.

Two questions are presented by this record, viz, whether there is substantial evidence in the record to support the finding of the appellate division as to the usual wholesale quantities of gauge glasses sold in the home market, and, second, whether there is substantial evidence in the record to support its findings as to the discounts allowable from the list prices.

Section 402 (c) of the Tariff Act of 1930 reads as follows:

SEC. 402. VALUE.

     *      *      *      *      *      *      *

(c) FOREIGN VALUE.—The foreign value of imported merchandise shall be the market value or the price at the time of exportation of such merchandise to the United States, at which such or similar merchandise is freely offered for sale to all

purchasers in the principal markets of the country from which exported, in the usual wholesale quantities and in the ordinary course of trade, including the cost of all containers and coverings of whatever nature, and all other costs, charges, and expenses incident to placing the merchandise in condition, packed ready for shipment to the United States.

The trial court held that the usual wholesale quantity of gauge glasses sold in the home market was 50 dozen, basing this holding upon a decision rendered by it in 1923, about eleven years before the exportation of the gauge glasses here involved. The trial court also relied upon the portion of the special agent's report hereinbefore quoted, but very evidently misconstrued the same for the decision states:

It will be observed that the special agent's estimate of what constitutes a usual wholesale quantity is considerably above the 50 dozen, which I have felt was a usual wholesale quantity.

The special agent did not state that the usual wholesale quantity sold in the home market was from 6 gross to 50 gross at a time, but that such was the usual quantity sold to the large buyers noted by him, viz., those coming under the heading of "Wholesale" in the affidavit of said Moncrieff. Clearly, in making said statement, the special agent did not take into consideration the quantities sold by the exporter to retailers for the purpose of resale.

The appellate division, in reversing the judgment of the trial court, held that the trial court was not warranted in resorting to a decision rendered eleven years previous in determining the usual wholesale quantity at the time of exportation of the merchandise here involved. The appellate division also held that, in determining the usual wholesale quantity of gauge glasses, the sales to retailers for resale should not be excluded. Its final determination was that the largest number of sales in wholesale quantities were in lots of one dozen gauge glasses, and therefore held that one dozen was the usual wholesale quantity, and that the discount applicable to such sales was 62½ per centum and 2½ per centum, plus cases and packing.

That the major portion, or greatest number, of sales or offers for sale in a wholesale quantity should be deemed to be the usual wholesale quantity is well established. *United States* v. *Minkus*, 21 C. C. P. A. (Customs) 382, T. D. 46912.

It is clear that, if it be proper to consider the sales by the exporter to retailers for resale in determining the usual wholesale quantity, then the judgment appealed from must be affirmed, for it is established that, if such sales were in wholesale quantities, the greater number of sales in wholesale quantities to all purchasers fell within the range of discounts applicable to sales of one dozen each.

It is true that the affidavit of said Moncrieff states that sales to retailers for resale are not in the usual wholesale quantities, but this

is merely a conclusion by him, drawn from the facts set out in detail in his affidavit. While a statement that a given quantity is or is not a usual wholesale quantity might in some circumstances be regarded as some substantial evidence of the fact, such a statement can have no weight as a statement of fact when all of the facts upon which the statement is made are disclosed. It then becomes merely a conclusion of the witness, which can have no weight with the court in determining what is a usual wholesale quantity.

The question therefore is, may sales to retailers of one dozen or more gauge glasses at a time, for resale, be considered in determining what are usual wholesale quantities in the sale of merchandise such as is here involved. Appellant has cited no authority to the effect that it is improper to take into consideration sales to retailers, for resale, in determining what are usual wholesale quantities. Of course, such sales are not the sole determining factor, but it is clear that they should be considered, together with other sales in wholesale quantities, in determining what are usual wholesale quantities. See *Goldmark & Sons Corp.* v. *United States*, 22 C. C. P. A (Customs) 358, T. D. 47378.

Funk & Wagnalls Standard Dictionary defines "wholesale" as follows:

The sale of goods by the piece, bulk, or quantity, opposed to *retail:* * * *.

"Retail" is defined by the same authority as follows:

The selling of goods in small quantities, especially by those who have bought in large quantities to resell at a profit.

The Century Dictionary defines "wholesale" as follows:

Sale of goods by the piece or in large quantity;—disting. from *retail.* * * *

Of course, where the price at which an article is sold does not vary according to quantities sold, no question of usual wholesale quantity can arise, and in such case a single article may sometimes be regarded as a usual wholesale quantity.

Were we to adopt appellant's theory and hold that sales by a manufacturer or wholesaler to a retailer, who purchases for resale, may not be considered in determining the usual wholesale quantities of merchandise, it would in many cases be impossible to arrive at the foreign value of merchandise, when, under another construction which we hold is proper, all of the statutory elements may be present to enable the finding of such value.

We find no error in the decision of the appellate division, holding that it is proper to consider sales of gauge glasses in lots of one dozen or more by the exporter to retailers purchasing for resale, together with other sales in wholesale quantities, in determining the usual wholesale quantity of gauge glasses sold or offered for sale in the home market.

We further find that there is substantial evidence in the record to sustain the finding of the appellate division of the usual wholesale quantity of such gauge glasses, sold or offered for sale as aforesaid.

As to the discounts allowable upon the wholesale quantity found by the appellate division to be the usual wholesale quantity, there is no dispute, and the court properly found such discounts to be 62½ per centum and 2½ per centum, plus cases and packing.

We think it proper to observe that the basis of the findings of the trial court and the appellate division, with respect to the usual wholesale quantity of gauge glasses, was the business practice of the manufacturer of the involved merchandise, although it appears that such manufacturer had competitors who were also manufacturing gauge glasses. However, both the Government and appellant proceeded upon the theory that the business of the manufacturer of the involved merchandise, with respect to usual wholesale quantities and the ordinary course of trade, was representative of the industry generally, and we therefore have so assumed in arriving at our conclusion herein.

In concluding this opinion, we wish to commend the frankness and completeness of the affidavit upon which appellant relies to establish foreign value of the merchandise. The managing director of the exporter stated all of the facts in great detail with respect to the business operations of the exporter, with the very evident desire to secure only such adjudication as the actual facts in the case might warrant.

For the reasons hereinbefore stated, the judgment appealed from is *affirmed*.